Thank you, Your Honor. I may have pleased the Court. My name is Chris Dove on behalf of Sanare Energy Partners. This is a bankruptcy appeal from an adversary proceeding which narrowly declared, or tried to narrowly declare, that Sanare had accepted on itself obligations relating to the WD-89 lease, an offshore lease. The Court said it would go no further than that. It was making that narrow holding, denied all summary judgments on the consequences of that ruling, said I'm going that far and no further. But the District Court in its review identified what it said adds spice to the case. The WD-89 properties did not transfer to Sanare. That ought to be undisputed. The Bureau of Ocean and Energy Management refuses to acknowledge that it's transferred because it refused to consent to the transfer. The Bankruptcy Court had entered an order in Petroquest's bankruptcy stating that leases, federal leases, will not transfer without the consent of the Department of the Interior. And so that ought to be undisputed. But it is. Petroquest claims that it has shed itself of all of the lease, all of the properties, all of the related contracts, in total, not merely their obligations, but they have no further responsibility to BOEM, to the operator E&E. That is their position. And I understand why they would have to take that position at some level. They don't want to admit that they failed to convey property that they promised to convey. We don't have a problem with that reading of the contract. The PSA freely acknowledges that we understand that we intend to transfer a list of properties, but there are conditions in which they will not transfer. And so we say that's fine, these did not transfer, and included in that failure to transfer is the obligations related to them. But Petroquest and the bankruptcy and district courts agreed by looking at one provision of the contract in isolation, said, well, you have accepted the obligations and we're not even going to touch the question of whether the entire thing transferred. And we believe that that is an error. This court should reverse and remand for further proceedings to consider all of the evidence, all of the contract as one united whole. And I'll begin with, again, this question that I think ought to be undisputed. The properties did not transfer. I can't believe that we're still having this dispute. The Bureau of Ocean Energy Management refused to consent. It is that simple. The bankruptcy court said they do not transfer. These leases were part of the bankruptcy estate. The court refused to allow them to transfer and they did not transfer. The related contracts, the production handling agreement, did not transfer because there's a provision in this contract, section 9.2D, that says that if you fail to get a necessary consent, those assets are not to be transferred. These agreements met that condition. Petroquest has said we think that perhaps that they did not fall into that category because they were not something where they would be void ab initio if consent was not granted. We've shown in our brief that that is not true. Under Louisiana law, the void ab initio is that something is absolutely or relatively null, and these are contracts that at the very least are relatively null and probably are absolutely null because of the failure of the federal government to consent. So they fall into the category. They were not transferred. And the logical consequences of it— Does that consent make them voidable or does that make them void ab initio? That is an excellent question, Judge Inglehart. Under Louisiana law, a relatively null contract is voidable. But what we're saying is that under the contract, when you look at the category, they're describing a category of contracts that will not transfer. And in describing that category, what they say is, if it's the sort of contract where the failure to consent would render it void ab initio. What we're saying is, absolutely, EANI could have gone to a court to say, I refuse to consent. You can't transfer this. But because it is an entire category of things that never transfer in the first place under the PSA, it falls into that category. Petroquest points out EANI never went to get that order, and our answer is, of course they didn't. Why would they? It never transferred in the first place because they never consented in the first place. But it is of the nature that it is void ab initio as understood in these contracts. And so therefore, neither the lease, because BOEM didn't consent, nor the production handling agreement, because EANI didn't consent, they did not convey to SINAR. So what? Well, this creates a situation where the obligations did not transfer either. The bankruptcy court tried to look very narrowly at section 11.1 of the PSA, which says, for assets, you assume all the obligations and liabilities related. Just as it says in section 2.1 and 9.1 that it conveys all of the assets that are listed. Well, that didn't happen here, and it didn't happen in 11.1 either for the same reason. Once an asset fails because nobody consents to its transfer, it is removed from the category of assets. Section 9.2D describes how that can happen. It explicitly says if you fail to get the necessary consent, then it is removed from the category of those that are transferred. In the very definition of an asset itself, which is lengthy and complex because the drafters of the contract chose to say asset has the meaning in section 2.1, and it's a fairly broad category, is items that, to the extent they may be assigned, the following, or these subject to their terms, conditions, and so on. By defining assets in that way, the contract uniformly recognizes. We anticipate that we're going to transfer a number of properties, but there are conditions that have to be met, and if they're not met, they drop out. This is not an uncommon style of contract. It's not exotic that we're seeking to read it this way, but it is a uniform reading, and it's a reading that harmonizes the contract and avoids absurd consequences. Our primary concern is that the way that PetroQuest reads the contract, OEM has to suffer that its rights have been abridged by a contract it was not a party to and it did not consent to. E&E has to acknowledge that its rights were harmed by a contract that it did not acknowledge, did not refuse to give timely consent to, and under Louisiana law, as under any Anglo-American law, I don't know about European law, but I imagine it would be the same, if a contract reading leads to an absurd result, then you don't accept that reading, no matter how otherwise clear you think the language may be. Moreover, we have the additional fact that in this case, there was the bankruptcy court's order. This all occurred in the context of a bankruptcy of PetroQuest. The bankruptcy court order said that the federal lease will not transfer unless the federal government gives its consent, and BOEM did not. It's unequivocal. The record absolutely proves that fact, and we're done. We believe that it is unfair and unreasonable to try to say that third parties' rights were abridged by this, or that basically, PetroQuest, which had the burden of obtaining these consents and failed to get them because it was not paying E&E's bills, can say, whoops, well, we didn't transfer the valuable properties to you, but nevertheless, you have agreed to accept all of the burdens of that same contract. So where does that leave us? We have a bankruptcy court order that we believe is erroneous, despite the judge's effort to try to render a very narrow ruling. He tried to say, 11.1 says that you accept obligations of assets, and that's all I'm going to say, and these are assets, so I'm going to wash my hands of it. What the judge failed to do in that limited analysis is to understand that by not grappling with the question of what is an asset, by not grappling with the fact that the contract moves properties in and out of the definition of an asset, that the ruling is essentially incorrect. It's not even right in its narrow view, and what's really remarkable about PetroQuest's position in its response brief, which we pointed out in our reply, they embraced the idea that the reason why the judge ruled only as narrowly as he did and refused to go any farther was because he recognized he had no power to tell the federal government what to do when it did refuse to consent. This is our point. When you have reached the point where you will have to abridge federal power by your reading of a contract, better to stop and realize you can't do that. That's not a sensible reading of the contract. The district court then on appeal, we believe, not only maintained the same error by saying, looking at 11.1, I believe that it says that the obligations transferred, and he then went a little farther in two ways that we think is additional error that this court should address in its opinion. The first by saying, and you assumed plugging and abandonment obligations. The bankruptcy court was very careful not to say that. The bankruptcy court had denied summary judgment on plugging and abandonment obligations. He did not go that extra step. We believe he shouldn't have even taken the step that he did, but that is error. And we also believe that it was error for the district court to start resorting to a selective view of the parole evidence in the record. As we've briefed in our brief, you don't get to go to parole evidence if you think that the contract is unambiguous, as these courts claimed that it was. And if you do, you certainly don't get to pick those pieces that you think are helpful to your position and disregard the others. What happened in this case is that Sonare behaved in accordance with its understanding of the contract. In that period of time where PetroQuest still had time to obtain the necessary consents, we behaved as though they were going to get the consents. We took all of the steps we had to under the contract. We were a good corporate citizen in that regard. But when that deadline came and went, everything fell apart and our position changed accordingly. Eaney started saying, I'm not dealing with Sonare, despite your efforts to make me deal with them, because we didn't consent. Sonare said, Eaney won't talk to us. What are we supposed to do? All of those should have been considered by the district court if it was going to consider parole evidence at all, but it shouldn't have considered parole evidence at all when it said that it was unambiguous. We believe that the contract is unambiguous in our favor or, as we've briefed, alternative. If this court believes that the bankruptcy court's ruling cannot be sustained, and we believe it cannot, you can remand for further findings because it is evidently ambiguous. It is a matter of law for this court to decide. Either way, reversal and remand would be the appropriate response. If the court has any further questions, I would be glad to answer them. Thank you, Counsel. Thank you. Ms. Hatfield? Yes, Your Honor. May it please the Court, I'm Heather Hatfield. I'm here on behalf of the District Court. And I'm here to report that the District Court has rejected the contract. The contract was a deal that they cut. It unequivocally assumed the plugging and abandonment obligations related to the West Delta 89 properties and now wants to rewrite the terms of the contract. The lower courts properly rejected Sonare's arguments based on the unambiguous language in the purchase and sale agreement for three reasons. First, the lower court's interpretation is the correct reading because it gives meaning to all of the provisions of the agreement and is consistent with the party's bargain. Second, Sonare cannot escape its bargain for liability or secure a windfall by relying on delayed third party consents that have no impact on their contractual obligations. And finally, the lower courts correctly identified and considered all issues presented by both parties in the agreement. The lower court's interpretation of the plain language of the purchase and sale agreement is the correct one. The fundamental issue in dispute is whether the West Delta 89 properties were assumed, whether the plugging and abandonment obligations for those properties were assumed by Sonare. And the clear answer is yes, based on two key provisions of the purchase and sale agreement. The first is the assumed obligation section, or section 2.1A, to perform and discharge all obligations and liabilities, including plugging, abandonment, and decommissioning liability with respect to the assets with a capital A. The definition of assets is at section 2.1, and there is no doubt that the West Delta 89 lease, the West Delta Wells, and the West Delta D platform are included in that definition. Specifically, section 2.1A indicates that the oil and gas leases more particularly described in Exhibit A, together with any and all other rights, title, and interests of the seller, are included in the definition of asset. Additionally, at Exhibit A, it identifies the West Delta 89 lease and the D platform as assets. Section 2.1B covers the West Delta Wells, and it's also listed on Exhibit B. Contrary to Sonare's argument, there are no limitations to the transfer of the leases themselves under the purchase and sale agreement. Sonare cites to no provisions limiting the transfer, and its attempt to shoehorn BOEM into section 2.1 fails because the plain language of that section simply does not contain that requirement. Further, the terms and conditions of the agreement allow post-closing consents and permitted encumbrances, which includes BOEM's consent and any other third-party consents. Those post-closing consents and permitted encumbrances would only be included if BOEM's consent is carved out of the definition of assets. Further, Sonare's arguments that the production handling agreement and participation agreement are not applicable contracts under section 2.1D also fail. First, those two agreements were capable of being assigned, and so they met the permissive May standard in section 2.1D. The production handling agreement and participation agreement also are separate and distinct from the West Delta 89 lease, the Wells, and the platform. And as I'll discuss in more detail in a few minutes, section 9.2D simply does not apply in this case. Finally, the concept that an asset has no basis in the contractual language. The definition of asset does not change. In fact, Sonare judicially admitted in its complaint below that the West Delta 89 lease was among the assets with a capital A conveyed to Sonare under the purchase and sale agreement. And to this day, Sonare still represents on its website that it owns and operates the West Delta 89 properties. Additionally, the lower court's interpretation is the only one that gives meaning to all of the provisions of the purchase and sale agreement. Sonare tries to distract from the controlling contractual provisions by arguing that the lower courts interpreted the assumed obligation section in isolation or too narrowly. Those arguments are not grounded in the contractual text. In fact, the assumed obligation section 11.1B is broadly written to delegate responsibilities and liabilities to Sonare irrespective of its ownership or operation of those assets. Sonare assumed the obligations and liabilities with respect to the assets with a capital A, not with respect to assets that were conveyed to the buyer at closing or assets for which consent to assign was received, simply with respect to the assets. And to avoid any confusion, the assumed obligation section expressly identifies everything that was not considered an assumed obligation. And those are defined as the excluded assets with a capital E, capital A, and the retained liabilities. It is undisputed in this case that the West Delta properties do not fall under the definition of excluded assets or retained liabilities. As a result, they are not carved out from the obligations that was or wasn't conveyed to Sonare from the assumed obligations in section 11.1. They would have said so. In fact, they made that distinction in multiple other places in the contract. For example, section 8.1, the confidentiality section, draws a distinction between such portion of the assets with a capital A that are not conveyed to buyer and the excluded assets. And that's because even if they were not conveyed to the buyer, the word asset is still capitalized. So an asset may not, whether or not it was conveyed to the buyer, would still fall under the definition of the word asset. Additionally, the fact that the parties knew how to distinguish between assets that may not have been conveyed and the excluded assets that were excluded from the assumed obligations is clear in that there are many sections that discuss permitted encumbrances, pre-closing responsibilities, and assets with negative value, to name a few. Put simply, Sonare's interpretation violates the cardinal rule of Louisiana law that all provisions in a contract must be given meaning. The lower court's textual analysis construed the purchase and sale agreement the way that gives effect to all provisions and should be affirmed. Additionally, the lower court's interpretation is consistent with the express purpose of this contract, which was to assign the plugging and abandonment liability to Sonare. Petroquest held multiple properties in the Gulf of Mexico and wanted to get out of the Gulf in order to mitigate its end-of-lease liabilities. So as a result, in the purchase and sale agreement, Sonare agreed to assume all of Petroquest's plugging and abandonment liabilities for all of its Gulf of Mexico assets with a capital A. And in exchange, Sonare paid $0 to Petroquest. Instead, it received a $3.75 million payment from Petroquest toward future plugging and abandonment costs. And after agreeing to the terms of the agreement, accepting the $3.75 million, operating the West Delta wells for multiple months, collecting revenues related to those wells, and billing joint working interest owners, and then unilaterally deciding to cease production on those wells, Sonare now denies that it owns any plugging and abandonment obligations. Put simply, the lower court's interpretation is the only one that results in the outcome that the parties always contemplated. And Sonare now wants to argue that their interpretation would—I'm sorry, the Petroquest interpretation would necessarily lead to a windfall for Petroquest. But it's exactly the opposite. Sonare's interpretation results in them benefiting from everything related to these particular assets and then unilaterally making the decision to shut the wells in so that the lease would expire, but avoiding all of its obligations and liabilities as it agreed to in the purchase and sale agreement. Second, Sonare's focus on Section 9.2D, or the transfer restriction section, is meant to distract from the relevant issues at hand. Section 9.2D and that nor does it alter the language in Section 11.1B. Put another way, even if Sonare is right and they prevail on their 9.2D argument, it would only change these assets—would then become excluded from the assets to be conveyed to buyer, still with a capital A. It does not result in the definition of the word asset being changed. Additionally, Section 9.2D does not apply to the West Delta 89 lease because the lease doesn't include any language requiring consent from a third party to transfer, and BOEM's consent is expressly excluded under the language of Section 9.2D. Sonare attempts to distract from this fact by pointing to the consent language in the production handling agreement and assign those agreements. Further, Section 9.2D only addresses and implicates a very specific type of consent. The exclusion procedure that's set forth in Section 9.2D says the failure to get a consent does not—that section would not apply unless the failure to timely obtain that consent would cause the assignment to either be void ab initio or the termination of a lease. And that Section 9.2D does not apply to the consents at issue because the type of consent that it addresses are not present in the production handling agreement or participation agreements. There are multiple types of consents to assign. The types that we see in Section 9.2D are what are considered hard consents, the highest level of consent. So failure to get the consent would result in the contract being terminated, the lease being terminated, or the agreement being void ab initio. The language in these two agreements is instead that consent cannot be unreasonably withheld or a soft consent. So put simply, Section 9.2D has nothing to do with the type of consent to assign provisions in these agreements. As a result, 9.2D should not even be considered as a part of the analysis as to whether Section 11.1 and Section 2.1 apply. Additionally, as was mentioned earlier, at best, the types of consent to assign provisions that we have here would result under Louisiana law in potentially the contract being ab initio, and as I've said, that doesn't apply to these agreements. With relative nullities under Louisiana law, the counterparty to the agreement, either NE or CLNF in this case, would have to go to a court and ask for that particular agreement to be held to be relatively null. Not only did that not happen in this case, but NE and CLNF, it is undisputed, actually consented to these assignments in August of 2018. So not only did they not go seek to have these agreements nullified, they actually ratified the agreements. Next, Sonari's arguments regarding BOEM are also a red herring. Sonari now argues that BOEM's failure to approve the transfer of the West Delta 89 properties before the lease expires changes the West Delta 89 properties, whether or not they were assets. And that's wrong. BOEM's consent is not required for Sonari to assume the obligations and liabilities in the assumed obligations section. Again, it does not change the contractual definition of the word assets, nor does it change the language in 11.1b. And in fact, the parties contemplated the possibility that BOEM's consent may not be obtained and provided for that possibility in the purchase and sale agreement. Section 9.2a expressly carves out post-closing consents, which includes BOEM's approval. PetroQuest's representations and warranties regarding the existence of consents to assign exclude customary post-closing consents. The parties also list post-closing consents as permitted encumbrances in this agreement. And the special warranty of title that PetroQuest provides expressly excludes permitted encumbrances in that warranty. Additionally, section 6.1 of the agreement says that the parties agree that operatorship may not be transferred either and provides for that contingency as well. Next, Sonari argues that the language in PetroQuest's lease from being an asset. But this, too, is wrong. PetroQuest's agreement in the confirmation order did not change the contractual interpretation of this issue. It simply restated that from BOEM's perspective, BOEM's consent is needed to transfer a lease, and that's always been undisputed. However, as between two private parties, they can assign plugging an abandonment liability as between them. And that's the issue we have here. Sonari wrongfully claims that PetroQuest takes the position that BOEM cannot deny a request to assign a lease. PetroQuest readily admits that BOEM has that power. But the question is, despite who BOEM may look to to do the plugging and abandonment work, whether or not the agreement at issue provides for how that work is going to be done. Additionally, Sonari argues that the lower court ruling strips BOEM and other third parties of the right to refuse an assignment. But as I said, BOEM absolutely can refuse an assignment. The question is whether PetroQuest can look to Sonari to fulfill those contractual obligations. And Sonari also argues that BOEM did not consent to the transfer of the contract out of being an ordinary contract where the parties can allocate responsibilities and liabilities. But that's exactly what the parties did. The parties allocated responsibility for plugging an abandonment liability regardless of whether the West Delta 89 property is transferred. Finally, the lower courts correctly identified and considered all issues raised by both parties in section 9.2D because he doesn't mention it in his order. But this is wrong. The court made clear that he found the terms of the purchase and sale agreement to be unambiguous with regard to the issues that both PetroQuest and Sonari put before him in their motions for summary judgment. The court reviewed all of the briefing and heard oral arguments. Most of the discussion in the briefing was about section 9.2D. Additionally, as I discussed before, section 9.2D does not alter the terms of section 11.1 or the definition of assets. So even if section 9.2D applied, it would not alter Sonari's obligations and liabilities as the court found. Additionally, Sonari argues that the bankruptcy court's order is inconsistent with his denial of the relief sought by PetroQuest is incorrect. PetroQuest sought broader relief than what the bankruptcy court ordered, and specifically PetroQuest sought a declaration the court ordered that Sonari was presently responsible for fulfilling, discharging, and paying all of the obligations and liabilities with respect to the West Delta properties. The bankruptcy court instead narrowed his holding to find that the West Delta properties and liabilities were owed. Additionally, the district court's affirmance of the bankruptcy court's interpretation was also correct. The district court agreed with the bankruptcy court's interpretation of the assumed obligations and definition of assets section, and that was the key finding of the court. The district court did not rely on parole evidence in affirming the bankruptcy court's holding, and Sonari conflates the court's citing of undisputed facts with the findings that support that holding. Finally, the court's reference to any facts in its order confirm rather than contradict the terms of the purchase and sale agreement. And certainly the court's reference to Sonari's P&A obligations was simply a restatement of exactly what section of the P&A agreement was in the purchase and sale agreement. The court did not withhold after the fact and avoid its bargain for obligations to plug and abandon the West Delta 89 properties. There is no doubt the West Delta 89 properties are identified by name as assets in the purchase and sale agreement. The plain, unambiguous language of the purchase and sale agreement makes clear that Sonari assumed the obligations and liabilities set forth in section 11.1. This court should not allow Sonari to rewrite the terms of the agreement after the fact and should uphold the lower court's holding. Any questions? Thank you, Counsel. Maru. Thank you, Your Honor. Sonari wants the deal that it made. We're not trying to change the contract. We want to enforce the contract that was written. To begin, a couple of points that my colleague made that I think should be clarified. The parties assigned in the contract to these properties a $1 million value. They were not thought to be a pig in a poke. These were thought to be valuable, useful things. The overall deal contemplated that other properties had a negative value, and that was the deal that they made, and that's fine. These properties were valuable. They were worth $1 million. And when they did not transfer because BOEM refused to allow it, that creates a problem. The other point that I would like to make is that we did decide to shut in the wells, but when we did so, we did so by and through Petroquest, with Petroquest's consent, because Petroquest had to because E&E had not consented. We were handcuffed by the fact that the consents were not granted. We had to go to Petroquest and say, you need to do these actions because these things have failed. The transfers have failed. So the facts support what we're saying. We're not being inconsistent in our reading of the record. Another thing that my colleague talked about was this supposed judicial admission that we made. We addressed this in our briefs. We had to briefly talk about this. At the time we filed our petition, what we said was that the WD-89 lease had transferred. Well, at the time we filed it, that's what we thought. BOEM had not yet ruled on it. They took an uncommonly long amount of time. By the time that they did refuse the transfer, we changed our position accordingly. You can see at the record 1062 to 1063 in our own summary judgment motion, we come out and say, we're going to prove to you that BOEM did not consent and that this is a problem for their claim that we owe obligations under this contract. We raised this point. It was put into play and it was all decided. This wasn't an admission that took the obligation to prove these facts out of the hands of the parties. But mostly I'd like to come back to this idea that the definition of asset is clear and final and supports their point of view. The problem is that they simply ignore several sections of 2.1 when they say that. They want to treat asset as something that remains true and steady for all time. But it cannot be because it has words of condition in it. This may be an odd contract to wrap your head around for that reason. It was for me when I first looked at it. The fact that a definition would have conditions in it. But it does. Contracts are only assets to the extent they may be assigned. And in this case, they tried to assign them. They couldn't. And so they ceased to be assets at some point in time when that consent was refused to be given. They can only be transferred subject to the terms and conditions of the lease. If the party refuses to give its consent to the transfer of the lease, it has failed its terms and conditions. Once again, the condition has failed. Something that was once an asset in the contemplation of the parties has ceased to be so. It's a mechanism that makes sense. It has practical effect. And that's all we're trying to do in this case. And as a final point, Petroquest likes to say that two private parties have the power to allocate these sort of damages among themselves. Well, there's two responses to that. First of all, this contract is not written like a contract that would do that. This contract assumes that entire assets are transferred or are not transferred. If you were going to allocate just responsibilities without also transferring the associated benefits, you would have written this very differently. Their argument completely disregards the bankruptcy court's ruling, which enters in order, binding on Petroquest and Cenari as a creditor, saying that if BOEM doesn't consent, the lease doesn't transfer. It doesn't say that but you may transfer obligations, or but I'm only talking about the benefits. The lease doesn't transfer. That is a problem they cannot manage to deal with. And in sum, the bankruptcy court thought it was doing the right thing. It tried to answer one little question to hope the parties would move this along. And I appreciate that. But in trying to look narrowly at one part of the contract, trying to issue one little ruling and saying, but whoa, I'm not going any further, I'm not saying any more, I certainly am not touching the question of what's going to happen when you claim that you transferred liabilities and BOEM is going to come in and say, I don't care that you think you did. I know who was liable. That was nevertheless error. It should be reversed and remanded for further proceedings. Thank you. The court will take this matter under advisement. That concludes the matters that are scheduled for oral argument today. We are adjourned until 9 o'clock tomorrow morning.